**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BARRIE BUCKNER AND VERNICE A. BUCKNER, | ) ) ) | FILED: JUNE 13, 2008 |
|  | ) | 08CV3410 |
| Plaintiffs, | ) | JUDGE SHADUR |
|  | ) | MAGISTRATE JUDGE COLE |
| vs. | ) | EDA |
|  | ) |  |
| MORTGAGE LENDERS NETWORK, USA; ADVANTAGE MORTGAGE CONSULTING, INC.; DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR THE MLMI TRUST SERIES 2007-MLM1; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; WILSHIRE CREDIT CORPORATION; and DOES 1-5, | ) ) ) ) ) ) ) ) ) ) |  |
|  | ) | **JURY DEMAND** |
| Defendants. | ) |  |

## COMPLAINT

### INTRODUCTION

1.    Plaintiffs bring this action against a "subprime" mortgage lender, its assignee, and others to secure redress for deception in mortgage loan terms and multiple violations of the Truth in Lending Act ("TILA") and implementing Regulation Z.

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under 28 U.S.C. Sects. 1331 (general federal question), 1337 (interstate commerce), and 15 U.S.C. Sect. 1601, et seq. (TILA).

3.    All defendants transact business in the District and are deemed to reside here.

## PARTIES

4.     Plaintiffs Barrie Buckner Vernice A. Buckner, husband and wife, own and reside in a home located at 48 Odyssey Drive, Tinley Park, Illinois, 60477.  They are ordinary consumers.

5.     Defendant Mortgage Lenders Network USA, Inc., is in the business originating subprime mortgage loans.  It does business in Illinois.  Its registered agent's office and address is Corporation Service Company, 422 Northwest Highway, Park Ridge, IL 60068.

6.     Defendant Advantage Mortgage Consulting, Inc. (Advantage"), is engaged in the business of a mortgage broker.  It does business in Illinois.  Its registered agent's name and address are Craig A. Shaffer, 2720 River Road, Des Plaines, Illinois 60018.

7.     Defendant Deutsche Bank National Trust Company ("Deutsche Bank"), as trustee, is engaged in the business of purchasing and holding to subprime residential mortgage loans.  It has principal offices at 60 Wall Street, Mail Stop NYC60-3012, New York, NY, 10005-2858.  It does business in Illinois.

8.     On information and belief, Deutsche Bank, as trustee, is the present legal owner of plaintiff's loan.  The name of the trust in which plaintiff's loan is securitized is Deutsche Bank National Trust Company as Trustee for the MLMI Trust Series 2007-MLN1.

9.     Does 1-5 are the current, actual owner(s) of plaintiffs' loan, if different from Deutsche Bank.  Ownership of such loans is not a matter of public record.  Plaintiffs will join the actual owner(s), if necessary, once its/their identity is learned through discovery.

10.     Defendant Wilshire Credit Corporation ("Wilshire") is engaged in the business of servicing residential mortgage loans.  It does business in Illinois.  Its registered agent

office and address are Ct Corporation System, 208 S. LaSalle Street, Suite #814, Chicago,

Illinois, 60604.

11.     On information and belief, Wilshire is the current servicer of plaintiffs'

loan.  As such, it claims the right to collect payments, report to credit bureaus and pursue

foreclosure.  It is named as a necessary party only.

12.     Defendant Mortgage Electronic Registration Systems, Inc. ("MERS"), is a

corporation that holds title to mortgages, as nominee.  It does business in Illinois.  Its registered

agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois

60604.  MERS holds title to the mortgage that resulted from plaintiffs' transaction.  It thus

claims rights with respect to the mortgage.  It is named as a party necessary only.

<u>**FACTS RELATING TO ALL COUNTS**</u>

13.     Prior to November 20, 2006, plaintiffs decided to refinance the mortgage

on their home in order to obtain "cash out" to complete ongoing renovation work on their

basement and to cover expenses relating to Mr. Buckner's home remodeling business.

14.     The mortgage broker with whom they dealt, Brian Cochrane of defendant

Advantage, promised plaintiffs they would receive $10,000 from the transaction. Cochrane was

an agent of Advantage.

15.     Cochrane also told plaintiffs that he would lower their monthly payment

from $3,325.00, the approximate payment amount at that time, which included amounts for the

escrow for real estate taxes and insurance, to $2,448.00, also inclusive of the escrow.

16.     In response to their requests, Cochrane repeatedly reassured plaintiffs that

their mortgage loan would have an escrow account for taxes and insurance.

17.     On the day originally set for closing, plaintiffs arrived for closing at the mortgage broker's office, as instructed.  (Closing was not held at the offices of Absolute Title Services, Inc., as stated on the HUD-1 Settlement Statement (<u>Exhibit C</u>, page 1, line H).)

18.     Upon arrival, plaintiffs were informed for the first time that they needed to *bring* cash to their closing.  Because they did not have cash with them, closing had to be rescheduled.

19.     Plaintiff never received any oral or written notification of changes in the loan terms that they had been quoted or promised, as required by Illinois law.

20.     Plaintiffs never received a final Truth In Lending Disclosure Statement, disclosing the annual percentage rate, the repayment schedule and other required information. This document was missing from the closing package that they took home from closing on November 20, 2008.

21.     After closing, plaintiffs learned for the first time that an escrow for taxes and insurance had not been included and that the monthly payment amount of $2,448.00 that they were quoted was, therefore, misleading.  In fact, with the amounts for hazard insurance and real taxes added, plaintiffs' monthly payment was higher than it had been before.

22.     When they called Cochrane after closing to inquire, he casually told them they could refinance six months hence and get a lower rate and an escrow account then.

23.     The following are documents relating to the loan:  a note (<u>Exhibit A</u>); a mortgage (with incomplete riders)(<u>Exhibit B</u>); a HUD-1 Settlement Statement (<u>Exhibit C</u>); and three federal Notice of Right to Cancel forms (<u>Exhibit D</u>).

24.     Plaintiffs needed and used the loan for personal, family and household purposes.

4

25.      Following closing, on information and belief ownership and servicing of the loan were assigned to defendants Wilshire and Deutsche Bank, respectively.

26.      Advantage and Mortgage Lenders Network gave plaintiffs a dangerous loan product.  The loan is a 30-year, Adjustable Rate Balloon Note amortized over 40 years.  It has starting, "teaser" interest rate of 8.9% for two years, after which the interest rate can increase to 11.9% on the first change date (December 1, 2008).  (Exhibit A, page 2).  Thereafter, the rate can increase by 1.0% in each six-month period, up to a maximum of 14.9%.  (Id.).  The interest rate never adjusts downward. (Id.).

27.      Defendants also charged plaintiffs $9,047.70 in points and fees.  (Exhibit C).  Moreover, Advantage accepted $3,206.25 yield spread premium ("YSP") payment from Mortgage Lenders Network in exchange for unnecessarily increasing plaintiffs' interest rate above the "par" rate they qualified for.  (Exhibit C, line 814).  On information and belief, plaintiffs qualified for an interest rate a full percentage point below the rate they received.

28.      The YSP made Advantage into Mortgage Lenders' Network's agent.

29.      On information and belief, Advantage was subsequently sued by the Office of the Illinois Attorney General for engaging in foreclosure rescue fraud and other predatory lending practices.

30.      On February 8, 2008, Mortgage Lenders Network had its corporate charter revoked by the Illinois Secretary of State.

31.      Deutsche Bank has now initiated a foreclosure action against plaintiffs in Illinois state court.

## COUNT I – TRUTH IN LENDING ACT

32.     Plaintiffs incorporate paragraphs 1-31.  This count is against Mortgage Lenders Network, Deutsche Bank and Does 1-5.  Wilshire and MERS are named as necessary parties.

## RIGHT TO RESCIND

33.     Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]**

**(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**

**(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**

**(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**

**(2) The consumer's right to rescind the transaction.**

**(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

## <u>GROUNDS FOR RESCISSION</u>

34.     In connection with the loan, Mortgage Lenders Network failed to provide plaintiffs with the required financial disclosures at the time the loan was consummated, in violation of 15 U.S.C. Sect. 1637, 12 C.F.R. Sect. 226.18 and the corresponding sections of the Official Federal Reserve Board ("FRB") Commentary on Regulation Z.  Defendant failed to provide plaintiffs with a final TILA Disclosure Statement.

35.    In addition, Mortgage Lenders provided plaintiffs with three copies of the federal Notice of Right to Cancel forms (<u>Exhibit D</u>) instead of the four required, i.e., two per mortgagor.  On information and belief, Mrs. Buckner was on title at the time the loan was originated.

36.    Further, the Notice of Right to Cancel forms (<u>Exhibit D</u>) are misdated.

37.    The instructions provided on the forms concerning the expiration of the rescission period contradict the final date to cancel stated on the form, violating TILA's strict "clear and conspicuous" disclosure standard.

38.    The dates on the forms deceptively purported to give plaintiffs four business days in which to cancel the loan when, in reality, they had only three days.

39.    On information and belief, the loan funded and was disbursed on the fourth day, November 24, 2006.

40.    Any one of these three violations alone is sufficient to confer on plaintiffs the extended, three-year right to rescind the loan.

41.    On May 8, 2008, plaintiffs notified defendants that they have rescinded the loan (<u>Exhibit E</u>).

42.    As of the date of this filing, no defendant has responded to plaintiffs' rescission notice, and the loan has not been rescinded.

43.    Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee."

44.    In addition, 15 U.S.C. Sect. 1635(g) provides:

**Additional relief**

8

> **In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b.    Refund of all finance charges plaintiffs have paid in connection with the loan, pursuant the TILA rescission formula;

c.    Statutory damages for failure to rescind;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

45.    Plaintiffs incorporate paragraphs 1-44.  This claim is against Mortgage Lenders Network and Advantage.

46.    Defendants violated §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging unfair and/or deceptive acts and practices and conduct toward plaintiffs.

47.    Defendants violated the ICFA through a combination of one or more of the following practices:  (a) prospective, oral misrepresentation of the loan terms or baiting-and-switching plaintiffs on the promise of a lower payment and cash out; (b) not providing any written notification of a change in loan terms; (c) not providing a copy of the TILA Disclosure Statement in the set of the closing documents given to plaintiffs so that they could more easily review and evaluate the repayment amount during the rescission period; and (d) deceptively

representing to plaintiffs that they had four days in which to cancel the loan when in fact they

only had three and could not legally have effectuated a cancellation of the loan on the purported,

fourth day.

48.    Defendants engaged in such conduct in the course of trade and commerce.

49.    Defendants engaged in such conduct with the intent that plaintiffs rely on

their deception.

50.    Defendants engaged in such conduct with the intent to injure plaintiffs.

51.    Plaintiffs have been damaged as a result and continue to be damaged.

52.    Defendants' conduct caused plaintiffs' injuries.

WHEREFORE, plaintiffs requests that the Court enter judgment in favor of

plaintiffs and against defendants for:

a.    Compensatory, actual, punitive and other appropriate damages;

b.    Attorney's fees, litigation expenses and costs.

c.    Such other or further relief as the Court deems appropriate.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

10

## JURY DEMAND

Plaintiffs demands trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## <u>NOTICE OF LIEN</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com

1

08CV3410
JUDGE SHADUR
MAGISTRATE JUDGE COLE
EDA

# EXHIBIT A

## ADJUSTABLE RATE BALLOON NOTE
## 30-YEAR TERM / 40-YEAR AMORTIZATION
### (Assumable during Life of Loan)

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**November 20, 2006**          **Schaumburg**                    **Illinois**

   [Date]                              [City]                         [State]

**48 ODYSSEY DRIVE   , TINLEY PARK, IL 60477**

                [Property Address]

**1.      BORROWER'S PROMISE TO PAY**

    In return for a loan that I have received, I promise to pay U.S. $      **320,625.00**  (this is called "Principal"), plus interest, to the order of the Lender.  The Lender is **MORTGAGE LENDERS NETWORK USA, INC.**   .  I will make all payments under this Note in the form of cash, check or money order.

      I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.      INTEREST**

    Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of   **8.9000**  %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

40/30 MULTISTATE ADJUSTABLE BALLOON NOTE (ADJUSTABLE RATE)  (Assumable)

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **January 1, 2007** .
I will make these payments every month until I have paid all of the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 1, 2036**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **10 RESEARCH PARKWAY, WALLINGFORD, CT   06492**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $   **2,448.53**             . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on **December 1, 2008** and may change on that day every **6th**       month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market , as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Five and Nine-Tenths** percentage points (      **5.90000**    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on **December 1, 2046** (which is called the "Amortization Date") in substantially equal installments at my new interest rate. The result of this calculation will be the new amount of my monthly payment.

**Notwithstanding the 40-year amortization period used to calculate my monthly payments, I understand that I must pay all amounts that I owe under this Note in full or on the Maturity Date, which is approximately 30 years from the date of this Note.**

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than.  **11.9000**     % or less than **8.9000**            %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One**            percentage point(s) (   **1.0000**     %) from the rate of interest I have been paying for the preceding **6**      months.

My interest rate will never be greater than           **14.9000**         %. My interest rate will never be less than **8.9000** %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

40/30 MULTISTATE BALLOON NOTE (ADJUSTABLE RATE) (Assumable)

4030N2MU 4/06                         Page 2 of 4                         Initials: _____

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayment without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Cost and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS UNDER THE PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is the guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of the conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extend permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEALS(S) OF THE UNDERSIGNED.

| | | |
|---|---|---|
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| **BARRIE BUCKNER** | | |
| | | |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |

*[Sign Original Only]*

40/30 MULTISTATE BALLOON NOTE (ADJUSTABLE RATE) (Assumable)

# EXHIBIT B

Return To:
**MORTGAGE LENDERS NETWORK USA, INC.**
**213 COURT ST. MIDDLETOWN, CT 06457**

Prepared By:
**MORTGAGE LENDERS NETWORK USA, INC.**
**213 Court St. Middletown CT 06457**

——————————— —[Space Above This Line For Recording Data]——————————————

# MORTGAGE

MIN 1002610-6200032919-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "**Security Instrument**" means this document, which is dated **November 20, 2006** ,
together with all Riders to this document.
(B) "**Borrower**" is
**BARRIE     BUCKNER**
**SPOUSE**

Borrower is the mortgagor under this Security Instrument.
(C) "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this
Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**ILLINOIS** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**    **Form 3014 1/01**

ⓋⓂⓅ®.-6A(IL) (0010)

Page 1 of 15                  Initials:_____

    VMP MORTGAGE FORMS - (800)521-7291



**(D) "Lender"** is **MORTGAGE LENDERS NETWORK USA, INC.**

Lender is a **corporation or association**
organized and existing under the laws of **Delaware**
Lender's address is **213 Court St. Middletown CT 06457**

**(E) "Note"** means the promissory note signed by Borrower and dated **November 20, 2006**
The Note states that Borrower owes Lender **Three Hundred Twenty Thousand, Six Hundred Twenty-Five and No/100 ----------------------** Dollars
(U.S. $    **320,625.00**    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 1, 2036**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

**Adjustable Rate Balloon Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _____

-6A(IL) (0010)                    Page 2 of 15                    Form 3014  1/01

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **COUNTY**
[Type of Recording Jurisdiction] of **COOK**                                                      [Name of Recording Jurisdiction]:
**SEE ATTACHED SCHEDULE A**

Parcel ID Number: **31-07-403-002**                          which currently has the address of
**48 ODYSSEY DRIVE**                                                                              [Street]
**TINLEY PARK**                                              [City], Illinois   **60477**      [Zip Code]
("Property Address"):

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
        THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
        UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
        **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of

Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the

Initials: _____

-6A(IL) (0010)                    Page 6 of 15                    Form 3014  1/01

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage**

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments form third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
BARRIE    BUCKNER                                    -Borrower


_____

_____ (Seal)
SPOUSE                                               -Borrower


_____ (Seal)        _____ (Seal)
                        -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                        -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                        -Borrower                                              -Borrower

**STATE OF ILLINOIS,**                                              **County ss:**

     I,                                  , a Notary Public in and for said county and

state do hereby certify that

**BARRIE     BUCKNER**

**SPOUSE**

                                                                                 ,

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

     Given under my hand and official seal, this **20th**          day of **November, 2006**     .

My Commission Expires:

_____

Notary Public

**6200032919**

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of the title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under this Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. This notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

6200032919

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **20th** day of **November    2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
**MORTGAGE LENDERS NETWORK USA, INC.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**48 ODYSSEY DRIVE   , TINLEY PARK, IL 60477**

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in
**the covenants, conditions
and restrictions in the declarations of ODYSSEY CLUB**

(the "Declaration"). The Property is a part of a planned unit development known as
**ODYSSEY CLUB**

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150 1/01**
**MIN- 1002610-6200032919-5**
Page 1 of 3                    Initials: _____
**-7R** (0411)      VMP Mortgage Solutions, Inc. (800)521-7291



**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

VMP-7R (0411)                    Page 2 of 3                    **Form 3150 1/01**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)        _____ (Seal)
**BARRIE    BUCKNER**        -Borrower        **SPOUSE**                    -Borrower


_____ (Seal)        _____ (Seal)
                            -Borrower                                    -Borrower


_____ (Seal)        _____ (Seal)
                            -Borrower                                    -Borrower


_____ (Seal)        _____ (Seal)
                            -Borrower                                    -Borrower


VMP®-7R (0411)                    Page 3 of 3                    **Form 3150 1/01**

# EXHIBIT C

11/20/06 11:40 AM

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | | |
|---|---|---|---|---|
| | | 1. [ ] FHA   2. [ ] FMHA   3. [X] Conv. Unins. 4. [ ] VA   5. [ ] Conv. Ins. | | |
| | | 6. File Number | 7. Loan Number | |
| | | 48013 | 6200032919 | |
| **Settlement Statement** | | 8. Mortgage Ins. Case No. | | |

| C. Note: | This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing: they are shown here for information purposes and are not included in the totals. |
|---|---|
| D. Name of Borrower: | BARRIE BUCKNER |
| E. Name of Seller: | |
| F. Name of Lender: | MORTGAGE LENDERS NETWORK USA, INC., 1200 JORIE BOULEVARD, OAKBROOK |
| G. Property Location: | 48 ODYSSEY DR., TINLEY PARK, IL 60477 |
| H. Settlement Agent: | Absolute Title Services, Inc (847) 285-5900                      TIN:    36-4105088 |
| Place of Settlement: | 2227 Hammond Drive, Suite B, Schaumburg, IL 60173 |
| I. Settlement Date: | 11/20/2006                               Proration Date:     11/27/2006 |

| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
|---|---|---|---|---|---|
| 101. | Contract sales price | | 401. | Contract sales price | |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 9,047.70 | 403. | | |
| 104. | | | 404. | | |
| 105. | PAYOFF TO CHASE HOME FINANCE LLC | 314,992.15 | 405. | | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower: | 324,039.85 | 420. | Gross amount due to seller: | 0.00 |
| 201. | Deposit or earnest money | | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 320,625.00 | 502. | Settlement charges to seller (line 1400) | 0.00 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes | | 511. | County taxes | |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 320,625.00 | 520. | Total reduction in amount due seller: | 0.00 |
| 301. | Gross amount due from borrower (line 120) | 324,039.85 | 601. | Gross amount due to seller (line 420) | 0.00 |
| 302. | Less amount paid by/for borrower (line 220) | 320,625.00 | 602. | Less total reduction in amount due seller(line 520) | 0.00 |
| 303. | CASH (X)FROM ()TO BORROWER | 3,414.85 | 603. | CASH ()FROM ()TO SELLER | 0.00 |

**SUBSTITUTE FORM 1099 SELLER STATEMENT** - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a

| L. Settlement Charges | | 11/20/06 11:40 AM | | File Number: 8013 | |
|---|---|---|---|---|---|
| 700. | Total sales/broker commission | | | **Paid From Borrower's Funds at Settlement** | **Paid From Seller's Funds at Settlement** |
| | Division of commission (line 700) as follows: | | | | |
| 701. | $ | | | | |
| 702. | $ | | | | |
| 703. | Commission paid at settlement | | | | |
| 704. | | | | | |
| 800. | Items payable in connection with loan | | | | |
| 801. | Loan origination fee | to | ADVANTAGE MORTGAGE | 1,995.00 | |
| 802. | Loan discount | | | | |
| 803. | Appraisal fee | to | DOUG HOPMAN            POCB 100.00 | | |
| 804. | Credit report | | | | |
| 805. | Lender's inspection fee | | | | |
| 806. | Mortgage insurance application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | TAX SERVICE FEE | to | MORTGAGE LENDERS NETWORK USA, INC. | 50.00 | |
| 809. | UNDERWRITING FEE | to | MORTGAGE LENDERS NETWORK USA, INC. | 549.00 | |
| 810. | PROCESSING FEE | to | ADVANTAGE MORTGAGE CONSULTING | 845.00 | |
| 811. | DOCUMENT PROCESSING FEE | to | MORTGAGE LENDERS NETWORK USA, INC. | 250.00 | |
| 812. | FLOOD CERTIFICATION | to | MORTGAGE LENDERS NETWORK USA, INC. | 8.50 | |
| 813. | | | | | |
| 814. | Yield Spread Premium | to | ADVANTAGE MORTGAGE CONSULTING     POCL 3206.25 | | |
| 815. | | | | | |
| 816. | | | | | |
| 817. | | | | | |
| 818. | | | | | |
| 900. | Items required by lender to be paid in advance | | | | |
| 901. | Interest from | 11/27/2006 to 12/1/2006 | at $78.1798/day for 4 days. | 312.72 | |
| 902. | Mortgage insurance premium for | | | | |
| 903. | Hazard insurance premium for | 1 yrs. | to ACCORD CORP | 877.80 | |
| 904. | | | | | |
| 905. | | | | | |
| 1000. | Reserves deposited with lender | | | | |
| 1001. | Hazard insurance | | | | |
| 1002. | Mortgage insurance | | | | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | | | | |
| 1005. | Annual assessments (maint.) | | | | |
| 1006. | | | | | |
| 1007. | | | | | |
| 1008. | | | | | |
| 1009. | | | | | |
| 1100. | Title charges | | | | |
| 1101. | Settlement or closing fee | to | Absolute Title Services, Inc | 150.00 | |
| 1102. | Abstract or title search | | | | |
| 1103. | Title examination | | | | |
| 1104. | Title insurance binder | | | | |
| 1105. | Document preparation | | | | |
| 1106. | Notary fees | | | | |
| 1107. | Attorney's fees to | | | | |
| | includes above items no.: | | | | |
| 1108. | Title insurance | to | Absolute Title Services, Inc | 1,196.00 | |
| | includes above items no.: | | | | |
| 1109. | Lender's coverage | $320,625.00 | $1,196.00 | | |
| 1110. | Owner's coverage | | | | |
| 1111. | INCOMING WIRE FEE | to | Absolute Title Services, Inc | 20.00 | |
| 1112. | DOC PROCESSING FEE | to | Absolute Title Services, Inc | 96.50 | |
| 1113. | | | | | |
| 1114. | | | | | |
| 1115. | | | | | |
| 1116. | | | | | |
| 1200. | Government recording and transfer charges | | | | |

**CERTIFICATION:** I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_____          _____
BARRIE BUCKNER

_____          _____

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____          _____

Absolute Title Services, Inc.                                                Date

**SELLER'S AND/OR PURCHASER'S STATEMENT** Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for checkwriting and input to the computers, but not for aforesaid accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

Purchasers/Borrowers                                                      Sellers

_____          _____
BARRIE BUCKNER

_____          _____

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

# EXHIBIT D

# NOTICE OF RIGHT TO CANCEL

Borrower/Owner: **BARRIE BUCKNER**
Borrower/Owner: **SPOUSE**
Address **48 ODYSSEY DRIVE**
 **TINLEY PARK, IL  60477**
Property: **48 ODYSSEY DRIVE  , TINLEY PARK, IL 60477**

**First**                                                          LOAN NO. **6200032919**
(Identification of Transaction)

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien, or security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is **November 20, 2006**                        ; or (2) the date you received your Truth in Lending disclosures; or

(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL

If you decide to cancel the new transaction, you may do so by notifying us in writing, at

 **Attention: FUNDING DEPARTMENT**
 **Mortgage Lenders Network USA, Inc.**
 **1200 Jorie Boulevard,**
 **Oak Brook, IL 60523**
 **You may also send your notice via facsimile to the same Attention, FUNDING DEPARTMENT at 630-573-9850.**

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **November 24, 2006**
(or midnight of the third business day following the latest of the three events listed above).                          (date)

If you send or deliver your written notice to cancel some other way, including via facsimile, it must be delivered to the above address no later than that time.

 **To better process your request, please also call the FUNDING DEPARTMENT at  1-888-458-8100  to let them know of your action.**

## I WISH TO CANCEL

_____     _____
Consumer's Signature                                             Date

---

Each of the borrowers/owners in this transaction has the right to cancel.  The exercise of this right by the borrower/owner shall be effective as to all borrowers/owners,

I acknowledge receipt of two copies of <u>NOTICE of RIGHT TO CANCEL</u> on

**November 20, 2006**

_____     _____
(Signature)                                        (Signature)
**BARRIE BUCKNER**                        **SPOUSE**

_____     _____
(Signature)                                        (Signature)

Right of Rescission (General)

NORTCGEN / 4/30/97 rev 10/2000 rev 6/02

# NOTICE OF RIGHT TO CANCEL

Borrower/Owner: **BARRIE BUCKNER**
Borrower/Owner: **SPOUSE**
Address **48 ODYSSEY DRIVE**
**TINLEY PARK, IL 60477**
Property: **48 ODYSSEY DRIVE , TINLEY PARK, IL 60477**

**First**                                                         LOAN NO. **6200032919**
(Identification of Transaction)

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien, or security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is **November 20, 2006** ; or (2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL
If you decide to cancel the new transaction, you may do so by notifying us in writing, at
**Attention: FUNDING DEPARTMENT**
**Mortgage Lenders Network USA, Inc.**
**1200 Jorie Boulevard,**
**Oak Brook, IL 60523**
  **You may also send your notice via facsimile to the same Attention, FUNDING DEPARTMENT at**
**630-573-9850.**
You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **November 24, 2006**
(or midnight of the third business day following the latest of the three events listed above).                (date)
If you send or deliver your written notice to cancel some other way, including via facsimile, it must be delivered to the above address no later than that time.
  **To better process your request, please also call the FUNDING DEPARTMENT**
  **at 1-888-458-8100 to let them know of your action.**

## I WISH TO CANCEL

_____          _____
Consumer's Signature                                       Date

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by the borrower/owner shall be effective as to all borrowers/owners,

I acknowledge receipt to two copies of NOTICE of RIGHT TO CANCEL on

**November 20, 2006**    _____        _____
                                      (Signature)                               (Signature)
                                   **BARRIE BUCKNER**                          **SPOUSE**

Right of Rescission (General)        _____        _____
                                      (Signature)                               (Signature)

NORTCGEN / 4/30/97 rev 10/2000 rev 6/02

# NOTICE OF RIGHT TO CANCEL

Borrower/Owner: **BARRIE BUCKNER**
Borrower/Owner: **SPOUSE**
Address **48 ODYSSEY DRIVE**
       **TINLEY PARK, IL 60477**
Property: **48 ODYSSEY DRIVE , TINLEY PARK, IL 60477**

_____**First**_____      LOAN NO. **6200032919**_____
          (Identification of Transaction)

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien, or security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is **November 20, 2006**_____ ; or (2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel the new transaction, you may do so by notifying us in writing, at
      **Attention: FUNDING DEPARTMENT**
      **Mortgage Lenders Network USA, Inc.**
      **1200 Jorie Boulevard,**
      **Oak Brook, IL 60523**
  **You may also send your notice via facsimile to the same Attention, FUNDING DEPARTMENT at 630-573-9850.**
You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **November 24, 2006**_____
(or midnight of the third business day following the latest of the three events listed above).    (date)

If you send or deliver your written notice to cancel some other way, including via facsimile, it must be delivered to the above address no later than that time.
  **To better process your request, please also call the FUNDING DEPARTMENT at 1-888-458-8100 to let them know of your action.**

### I WISH TO CANCEL

_____     _____
Consumer's Signature                 Date

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by the borrower/owner shall be effective as to all borrowers/owners,

I acknowledge receipt to two copies of NOTICE of RIGHT TO CANCEL on

**November 20, 2006**

_____     _____
(Signature)                          (Signature)
**BARRIE BUCKNER**                **SPOUSE**

_____     _____
(Signature)                          (Signature)

Right of Rescission (General)

NORTCGEN / 4/30/97 rev 10/2000 rev 6/02

# EXHIBIT E

**LAW OFFICES OF AL HOFELD, JR., LLC**
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - 312-345-1004
Fax - 312-346-3242 (FAX)
Email:  al@alhofeldlaw.com

May 8, 2008

**BY REGULAR MAIL:**

Mortgage Lenders Network USA, Inc.
C/o registered agent,
Corporation Service Company
422 Northwest Highway
Park Ridge, IL 60068

Mortgage Electronic Registration Systems, Inc.
c/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite #814
Chicago, IL 60604

Wilshire Credit Corporation,
14523 SW Millikan Way, suite 200
Beaverton, OR 97005

Wilshire Credit Corporation
c/o registered agent,
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Wilshire Credit Corporation
C/o Pierce and Associates
1 North Dearborn, Suite 1300
Chicago, IL 60602

Deutsche Bank National Trust Company
60 Wall Street, Mail Stop NYC60-3012
New York, NY 10005-2858

Re:     Notice of TLA rescission, claim and lien for Barrie Buckner, 48
        Odyssey Drive, Tinley Park, IL 60477; closing date November 20,
        2006, originated by Mortgage Lenders' Network USA, Inc.

1

Ladies/Gentlemen:

The above client hereby gives notice that he rescinds the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above client to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to your obligation under 15 U.S.C. §1641(f)(2).

Finally, please provide a complete account history so that we may compute the appropriate tender amount.

Sincerely,

Al Hofeld, Jr.

Cc:    client

2

I, Al Hofeld, Jr., under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the listed addressees on May 8, 2008.

Al Hofeld, Jr.

3